**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIAN SILVA, ET AL<br><br>    Plaintiffs,<br><br>  v.<br><br>JOSE VAZQUEZ COFRESI, ET AL<br><br>    Defendants. | **ECF CASE**<br><br>**Case No. 13-cv-3200-CM-JCF**<br><br>**DEFENDANTS' ANSWER TO COMPLAINT AND COUNTERCLAIMS** |
| JOSE VAZQUEZ<br><br>    Counterclaimant,<br><br>  v.<br><br>JULIAN SILVA<br><br>    Counterclaim Defendant | |

  Defendants JOSE VASQUEZ COFRESI ("Vasquez") , individually, and HANDLE WITH CARE PRODUCTIONS, INC. ("Handle With Care"), (collectively "Defendants") respond to the Complaint filed by JULIAN SILVA, individually, and JULIAN SILVA, on behalf of HANDLE WITH CARE PRODUCTIONS, INC. ("Plaintiff") and assert Counterclaims as follows:

<b>ANSWER</b>

  Defendants generally deny any and all allegations, speculation, and factual assertions made by the Plaintiff in its Complaint except those expressly admitted below:

  1.  Defendants admit this paragraph.

  2.  Defendants admit this paragraph.

  3.  Defendants admit this paragraph.

  4.  Defendants admit Plaintiff Julian Silva is a California resident and deny the remainder of this paragraph.

  5.  Defendants deny this paragraph.

  6.  Defendants deny this paragraph.

  7.  Defendants admit this paragraph.

8.      Defendants deny this paragraph.

9.      Defendants admit that Plaintiff and Defendant Vazquez played together in the band Latin Sounds, but deny the remainder of this paragraph.

10.     Defendants admit Vasquez moved to Louisiana in 1996 and deny the remainder of this paragraph.

11.     Defendants deny the allegations of this paragraph.

12.     Defendants admit that LCDS released an album entitled "A Mi Pueblo" in 1999.  Defendants deny the remainder of this paragraph.

13.     Defendants admit this paragraph.

14.     Defendants lack sufficient information to admit or deny the allegations in this paragraph.  Accordingly, Defendants deny the allegations in Paragraph 14.

15.     Defendants deny this paragraph.

16.     Defendants admit that Messrs. Rodriguez, Dilone and Prokepz assisted the band.  Defendants deny the remainder of this paragraph.

17.     Defendants admit that LCDS occasionally played live shows in the New York area, but they played only cover songs.

18.     Defendants deny this paragraph.

19.     Defendants admit that LCDS played at one bar in New York.  Defendants deny the remainder of this paragraph.

20.     Defendants deny this paragraph.

21.     Defendants deny this paragraph.

22.     Defendants deny this paragraph.

23.     Defendants deny this paragraph.

24.     Defendants admit that Plaintiff and Defendant Vazquez verbally agreed that each would retain copyright to all songs that they composed individually, but that Vazquez would retain sole copyright to any songs he arranged, even if Plaintiff composed part of the song.

25.     Defendants lack sufficient information to form a response and on that basis deny the allegations contained therein.

26.     Defendants lack sufficient information to form a response and on that basis deny the allegations contained therein.

2

27.    Defendants admit this paragraph.

28.    Defendants admit this paragraph.

29.    Defendants admit Plaintiff created the cover art and layout of the album jacket and deny the remainder of this paragraph.

30.    Defendants lack sufficient information to form a response and on that basis deny the allegations contained therein.

31.    Defendants admit that Defendant Vazquez formed HWCP with the State of New York in 2005.  Defendants deny the remainder of this paragraph.

32.    Defendants admit that Defendant Vazquez used the HANDLE WITH CARE mark in commerce.  Defendants deny the remainder of this paragraph.

33.    Defendants admit that Defendant Vazquez applied for federal registration for the HANDLE WITH CARE PRODUCTIONS mark.  Defendants deny the remainder of this paragraph.

34.    Defendants deny this paragraph.

35.    Defendants deny that the HWCP bank account was to benefit both Plaintiff and Defendant Vazquez.  Defendants admit the remainder of this paragraph.

36.    Defendants admit this paragraph.

37.    In answer to Paragraph 37 of the Complaint, Defendants lack sufficient information to form a response and on that basis deny the allegations contained therein.

38.    Defendants deny this paragraph.

39.    Defendants admit Plaintiff created album art for Mi Tumbao Social and that Plaintiff created some of the arrangements of some of the songs on the album. Defendants deny the remainder of this paragraph.

40.    Defendants admit that Plaintiff registered some copyrights, including for works created by Defendant Vazquez, but deny the remainder of this paragraph.

41.    Defendants admit this paragraph.

42.    Defendants admit that Plaintiff wrote arrangements of music created by the other members of the band.  Defendants deny the remainder of this paragraph.

43.    Defendants admit that Plaintiff directed the sound recordings and deny the remainder of this paragraph.

44.     Defendants lack sufficient information to form a response and on that basis deny the allegations contained therein.

45.     Defendants deny this paragraph.

46.     Defendants deny this paragraph.

47.     Defendants admit there was a CD release party in or about April 2012 and deny the remainder of this paragraph.

48.     Defendants deny this paragraph.

49.     In answer to Paragraph 49 of the Complaint, Defendants lack sufficient information to form a response and on that basis denies the allegations contained therein.

50.     Defendants deny this paragraph.

51.     Defendants deny this paragraph.

52.     Defendants deny this paragraph.

53.     Defendants deny this paragraph.

54.     Defendants admit that the band went to Europe in July 2012.  Defendants deny the remainder of this paragraph.

55.     Defendants admit this paragraph.

56.     Defendants deny this paragraph.  **?????**

57.     Defendants deny this paragraph.

58.     Defendants admit the first sentence of this paragraph and deny the remainder of this paragraph.

59.     Defendants deny this paragraph.

60.     Defendants admit that Plaintiff failed to show up for a scheduled performance on August 18, 2012.  Defendants deny the remainder of this paragraph.

61.     Defendants deny this paragraph.

62.     Defendants deny this paragraph.

63.     Defendants admit that they opened a new Facebook account.  Defendants always had full control over HWCP, so Defendants deny the remainder of this paragraph.

64.     Defendants admit that Defendant Vazquez transferred the referenced trademark to himself in exchange for payment, pursuant to his authority as the shareholder and sole officer of HWCP.  Defendants deny the remainder of this paragraph.

65.     Defendants admit this paragraph.

66.      Defendants deny this paragraph.

67.      Defendants deny that Defendant Vazquez lacked the consent of HWCP to file the trademark application.  Defendants admit the remainder of this paragraph.

68.      Defendants deny this paragraph.

69.      Defendants deny this paragraph, except to admit that Plaintiff did not transfer any shares or ownership rights, since Plaintiff had not rights to do so.

70.      Defendants deny this paragraph.

71.      Defendants deny this paragraph.

72.      Defendants admit this paragraph.

73.      Defendants deny this paragraph.

74.      Defendants admit this paragraph.

75.      Defendants admit that Defendant Vazquez corrected catalogs on file with ASCAP.  Defendants deny that any of the respective works were attributable to Plaintiff or that Defendant's actions were to Plaintiff's detriment.

76.      Defendants admit this paragraph.

77.      Defendants deny that ASCAP notified them of any objections. Defendants admit that they did not respond to the ASCAP complaint until it was too late. Defendants lack knowledge to respond to the remaining allegations in this paragraph.

78.      Defendants admit that Defendant Vazquez dissolved HCWP in 2012. Defendants deny the remaining allegations in this paragraph.

79.      Defendants admit that Plaintiff did not receive any distributions from HWCP in late 2012 deny the remaining allegations in this paragraph.

80.      Defendants admit receiving the notice referenced in this paragraph.

81.      Defendants admit this paragraph.

82.      Defendants deny that the copyright registrations referenced in this paragraph were improper.  Defendant Vazquez filed corrections for the referenced copyright registrations.  Defendants admit the remainder of this paragraph.

83.      Defendants deny this paragraph.

84.      Defendants admit that Plaintiff did not sign any assignments or other assignments.

85.      Defendants deny this paragraph.

86.        Defendants deny this paragraph.

87.        Defendants deny this paragraph.

88.        Defendants deny this paragraph.

89.        Defendants deny this paragraph.

90.        Defendants deny this paragraph.

91.        Defendants deny this paragraph.

92.        Defendants deny this paragraph.

93.        Defendants deny this paragraph.

94.        Defendants deny this paragraph.

95.        Defendants deny this paragraph.

96.        Defendants deny this paragraph.

97.        Defendants deny this paragraph.

98.        Defendants deny this paragraph.

99.        Defendants deny this paragraph.

100.       Defendants deny this paragraph.

101.       Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

102.       Defendants deny this paragraph.

103.       Defendants deny this paragraph.

104.       Defendants deny this paragraph.

105.       Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

106.       Defendants deny this paragraph.

107.       Defendants deny this paragraph.

108.       Defendants deny this paragraph.

109.       Defendants deny this paragraph.

110.       Defendants deny this paragraph.

111.       Defendants deny this paragraph.

112.       Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

113.       Defendants deny this paragraph.

114.     Defendants deny this paragraph.

115.     Defendants deny this paragraph.

116.     Defendants deny this paragraph.

117.     Defendants deny this paragraph.

118.     Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

119.     Defendants deny this paragraph.

120.     Defendants deny this paragraph.

121.     Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

122.     Defendants deny this paragraph.

123.     Defendants deny this paragraph.

124.     Defendants deny this paragraph.

125.     Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

126.     Defendants deny this paragraph.

127.     Defendants deny this paragraph.

128.     Defendants deny this paragraph.

129.     Defendants deny this paragraph.

130.     Defendants deny this paragraph.

131.     Defendants deny this paragraph.

132.     Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

133.     Defendants deny this paragraph.

134.     Defendants deny this paragraph.

135.     Defendants deny this paragraph.

136.     Defendants deny this paragraph.

137.     Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

138.     Defendants deny this paragraph.

139.     Defendants deny this paragraph.

140.     Defendants deny this paragraph.

141.     Defendants deny this paragraph.

142.     Defendants deny this paragraph.

143.     Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

144.     Defendants deny this paragraph.

145.     Defendants deny this paragraph.

146.     Defendants deny this paragraph.

147.     Defendants deny this paragraph.

148.     Defendants deny this paragraph.

149.     Defendants deny this paragraph.

150.     Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

151.     Defendants admit this paragraph.

152.     Defendants deny this paragraph.

153.     Defendants deny this paragraph.

154.     In answer to Paragraph 154 of the Complaint, Defendants lack sufficient information to form a response and on that basis denies the allegations contained therein.

155.     Defendants deny this paragraph.

156.     Defendants deny this paragraph.

157.     Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

158.     Defendants deny this paragraph.

159.     Defendants deny this paragraph.

160.     Defendants deny this paragraph.

161.     Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

162.     Defendants admit the allegations in the first sentence of this paragraph, and deny the allegations in the second sentence.

163.     Defendants deny this paragraph.

164.     Defendants deny this paragraph.

165.	Defendants deny this paragraph.

166.	Defendants deny this paragraph.

167.	Defendants deny this paragraph.

168.	Defendants repeat and reallege the above admissions and denials as though fully set forth herein.

169.	Defendants deny this paragraph.

170.	Defendants deny this paragraph.

171.	Defendants deny this paragraph.

172.	Defendants deny this paragraph.

## AFFIRMATIVE DEFENSES

And, as for separate affirmative defenses, Defendants allege as follows:

### FIRST AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

173.	Plaintiff is barred from recovery in whole or in part because Plaintiff would be unjustly enriched if it is permitted to recover on the claims.

### SECOND AFFIRMATIVE DEFENSE
### (Unclean Hands)

174.	Plaintiff is barred from recovery by virtue of its inequitable conduct and/or unclean hands.

### THIRD AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

175.	Plaintiff is barred from recovery against Defendants because Plaintiff failed to exercise reasonable efforts to mitigate damages, if any, caused by the acts of Defendants.

## FOURTH AFFIRMATIVE DEFENSE
### (Acts and Omissions)

176.     Plaintiff's right to seek any relief in its claims is barred in whole or in part by virtue of the acts and omissions of Plaintiff, its agents, servants, employees, attorneys, and others within Plaintiff's control.

## FIFTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

177.     Plaintiff's complaint, and each and every purported cause of action therein, fails to allege facts sufficient to state a claim upon which relief can be granted.

## SIXTH AFFIRMATIVE DEFENSE
### (Laches)

178.     Plaintiff's complaint, and each and every purported cause of action therein, is barred by the doctrine of laches.

## SEVENTH AFFIRMATIVE DEFENSE
### (Lack of Injury or Damages)

179.     Plaintiff has suffered no injury or damages as a result of any acts or omission of Defendants.

## EIGHTH AFFIRMATIVE DEFENSE
### (Breach of Contract)

180.     Plaintiff has breached the oral contract with Defendant.

## NINTH AFFIRMATIVE DEFENSE
### (Waiver)

181.     Plaintiff waived his rights in an agreement with Defendants.

## TENTH AFFIRMATIVE DEFENSE
### (Lack of Standing)

182.     Since Plaintiff was not a shareholder in Handle With Care Productions, Inc., Plaintiff lacks standing to bring any derivative action.  Plaintiff has also violated Corporations Law Section 627.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Setoff)

183.      Defendant is entitled to setoff sums owed by Plaintiff to Defendants against any amounts owed to Plaintiff.

### Right to Assert Additional Defenses

184.      Defendants presently have insufficient knowledge or information on which to form a belief as to whether additional, as yet unstated affirmative defenses are available.

WHEREFORE, Defendants request that

    a.  All claims brought against them by Plaintiff be dismissed;

    b.  Plaintiff take nothing in this action,

    c.  Judgment enter on behalf of Defendants, together with attorneys fees, costs and interest; and

    d.  Defendants be awarded such further legal and equitable relief as the Court deems proper.

DEFENDANTS HEREBY DEMAND A TRIAL BY JURY PURSUANT TO FED. R. CIV. P. 38 AND CONSTITUTIONAL AMENDMENT SEVEN.

### COUNTERCLAIMS

Defendant and Counterclaimant Jose Vazquez alleges his counterclaims against Plaintiff as follows:

### Preliminary Statement

1.      As set forth in the foregoing Answer, there is no factual or legal basis for Plaintiff Julian Silva's Complaint.  Plaintiff contends that he was a 50% shareholder in Handle With Care Productions, Inc. ("HWCP").  There was never any agreement between Jose Vazquez and Silva that Silva was to own any interest in the corporation.

2.      Silva's claims regarding HWCP – if true – would subject him to liability because he never contributed any money or other assets to the corporation.  Accordingly,

if his claims were true, he would owe Vazquez and HWCP substantial sums of money pursuant to his claimed ownership interest.

## The Parties

3.      Counterclaimant Jose Vazquez is an accomplished musician, composer and bandleader.  Vazquez is a resident of Bronx County, New York.

4.      Plaintiff and Counterclaim Defendant Julian Silva plays the bongos and saxophone.  Upon information and belief, Silva is now a resident of California.

## Jurisdiction and Venue

5.  This Court has jurisdiction over Vazquez's counterclaims pursuant to 28 U.S.C. § 1331 because the first and second counterclaims involve federal questions under the Copyright Act, 17 U.S.C., § 101, et seq., the Lanham Act, 15 U.S.C. § 1051, and the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq.  This Court has jurisdiction over the remaining state law counterclaims pursuant to the Court's supplemental jurisdiction. 28 U.S.C. § 1367.

6.  Venue for the counterclaims is proper in this judicial district because the actions underlying the counterclaims took place in this judicial district.

## Factual Background

7.      In the mid-to-late 1990's, Vazquez formed a band in Louisiana.  Vazquez organized and owned the band, and he maintained all of the assets of the band.  Vazquez named the band "Los Calientes del Sol" ("LCDS").

8.  At or about the same time, Vazquez formed a company named Caliente Productions to represent and book LCDS, and to record and distribute the band's recorded music.

9.  In 1998, LCDS began recording an album of original compositions.  Vazquez contributed the following compositions to this album:

> -- "Quisiera Tenerte"
>
> -- "Dale"
>
> -- "Estoy"
>
> -- "Hoy Sufro"
>
> -- "Soy Sonero"

10.     Vazquez paid all costs for the recording and production of this LCDS album.  Vazquez paid his sister to design the album cover art, and he paid the photographers for the album photographs.

11.     Vazquez titled this album "A Mi Pueblo", which is Spanish for "my people."  Vazquez chose the title because of the term's meaning.

12.     In 2000, Vazquez moved to New York City to continue his musical career. He reorganized LCDS around this time in New York.

13.     In 2000, Vazquez gave money to bandmembers Hector F. Martinez and Silva.  From time to time, Silva participated in the activities of LCDS.

14.     Around the same time, Vazquez changed the band's name to Los Calientes.  In 2005, Vazquez changed the band's name to La Excelencia (the "Band"). Vazquez continued to own all rights in and to the Band, including the band's name, La Excelencia.

15.  In 2005, Vazquez and Silva orally agreed that, from that time forward, the copyright in each composition would be fully owned by the composition's composer, regardless of who arranged the music for the song.  Vazquez and Silva did not commit this agreement to writing.

16.     The members of the Bad agreed that all money made from recorded music was to be split equally between Vazquez, Silva and Edwin Perez, as long as they each worked on the recording at issue.

17.  In 2006, the Band released a new album titled "Salsa con Conciencia."  Silva did the artwork for the album.  In the artwork, Silva wrongfully gave himself credit for all music on the album.  When Vazquez asked Silva why he wrote "All music by Julian Silva" on the album, Silva responded that he meant the arrangements and not the melodies.

18.  On or about October 17, 2006, Vazquez used his own money to form Handle With Care Productions, Inc., a New York business corporation ("HWCP").  Vazquez was the president and sole shareholder of HWCP, owning all 200 shares of the corporation. The other members of the Band, including but not limited to Silva, agreed that Vazquez was the sole shareholder of HWCP.

19. Vazquez formed HWCP to serve as the booking agent and manager of the Band, and also to act as a record label for the Band's sound recordings. Vazquez ran HWCP out of his living room.

20. At all times, Vazquez and HWCP were responsible for all expenses for live performances of the Band, including hotel, meal, transportation and telephone expenses while on tour.

20. In 2008, Vazquez and HWCP rented a recording studio for the Band to record a new album, eventually titled "Mi Tumbao Social." Vazquez and HWCP also paid for all meals for the band and crew, and any other recording costs. Vazquez borrowed some of the money from a third party to pay these expenses.

21. Silva again did the artwork for the "Mi Tumbao Social" album.

22. During the recording of this album, Vazquez lent Silva a multitrack recording machine, valued at over $5,000. Silva has failed and refused to return this machine to Vazquez, despite Vazquez's demands therefor.

23. In 2010, Silva began to talk about moving to California and leaving the Band. Also in 2010, Silva asked Vazquez if he could start a new band in California under the name La Excelencia. Because of the money and hard work he had invested in the band and name, Vazquez refused Silva's request.

24. Later in 2010, Silva told Vazquez that he was broke and needed money. Vazquez agreed to lend Silva $4,000 of his own money, and Silva agreed to repay the money later. To date, Silva has not repaid any of the $4,000.

25. In early 2011, Silva appeared to have lost interest in the Band. He demanded that Vazquez hire an attorney and an accountant for the band, and he also demanded that Vazquez sign a partnership agreement with Silva. Because there was no partnership between them and because Vazquez was the sole shareholder and officer of HWCP, Vazquez refused to sign a partnership agreement with Silva.

26. Silva continued to ask Vazquez for money, and, later in 2011, Vazquez borrowed more money from Johan Vrancken, a booking agent for the band, to loan to Silva. Vazquez lent approximately $4,000 more to Silva. To date, Silva has not repaid any of this money, either.

27.  In 2011, Vazquez took the Band into the studio to record a new album. Vazquez and HWCP again paid all of the expenses of the recording sessions, including studio rent, musician fees, meals, and other recording fees.  Silva did not contribute any money to this recording.

28.  Silva had little interest in the recording sessions, appearing sporadically and contributing little.  Silva barely contributed any work to the arrangements for the album.

29.  Through the efforts of Vazquez and HWCP, the album was eventually released in 2012 under the title "Ecos Del Barrio."

30.  Vazquez and Johan Vrancken booked a major tour for the Band for the second half of 2012.  When Vazquez pressed Silva whether he could commit to the tour, Silva told Vazquez that he needed more money.  Vazquez again borrowed over $1,000 from Vrancken to loan to Silva, with Silva's promise that he would pay Vazquez back. To date, Silva has not paid back Vazquez any of this loan.

31.  In July 2012, four days before the start of the tour, Silva told Vazquez that he would not be able to make the tour and that Vazquez should hire a substitute for Silva.

32.   Then, on the first day of the tour, Silva sent Vazquez a text message that he was able to participate in the concert tour, and that Vazquez and HWCP should buy him a last minute plane ticket.  Silva also accused Vazquez and Vrancken of kicking him out of the band, asserting that the Band was Silva's band.

33.  During the tour, band member Tokunori Kajiwara, at Silva's direction, took all of the band's printed music  and arrangements and refused to allow Vazquez or the other band members to use it.  The actions of Silva and Kajiwara jeopardized the Band's tour, making it difficult to perform live without the printed music and arrangements.

34. In late 2012, after the conclusion of the tour, the recording studio that the Band used to record "Mi Tumbao Social" and "Ecos del Barrio" called Vazquez and told him that Silva was attempting to remove the master sound recordings (the "Masters") for both albums from the studio.  Vazquez told the studio personnel that he and HWCP owned the Masters and Silva had no rights in them.

35.     Despite the fact that Vazquez and HWCP owned the Masters and Silva had no rights in them, Silva took them anyway.

36.     In or about January 2013, Silva cancelled a scheduled contractual performance with the Band on the morning of the performance, jeopardizing the Band's performance contract.

37.   The same day, Tokunori Kajiwara admitted to Vazquez that he had been working with Silva to undermine Vazquez and the Band so that Silva could take control of the Band.

38.   Shortly thereafter, Silva finally abandoned the Band, leaving the Band without repaying any of the money Vazquez lent him and without contributing any money to the Band's recording expenses or funding of HWCP.

39.   After leaving the Band, Silva called and emailed promoters and club managers seeking to cancel the Band's shows by falsely claiming that Vazquez would not appear at scheduled performances.

40.   In September 2012, an attorney representing Silva contacted Vazquez to demand that Vazquez stop using the La Excelencia name.  The attorney also alleged that Vazquez had no rights to use certain of the musical works contained in the albums recorded by the Band, or to operate of manage the band, "including but not limited to booking performance dates, without Mr. Silva's express written consent", all despite Silva having no ownership of HWCP or the Band.

41.     Silva has also, without authority, demanded that the CD Baby website remove the Band's CD's from its website, resulting in damages to the Band.

42.     Upon information and belief, Silva has and continues to threaten members of the Band if they continue to work with Vazquez.

43.     On or about November 23, 2012, weary of Silva's constant attacks on the Band and attempts to interfere with HWCP's business, Vazquez dissolved HWCP.

44.     At the time he dissolved HWCP, Vazquez had spent over $70,000 of his own money on HWCP and the Band, including the loans to Silva.  No other band member, including Silva, had contributed financially to HWCP or the Band.

## The Trademarks

45.     On June 29, 2010, HWCP filed a federal trademark application for the mark LA EXCELENCIA.  The mark was registered on February 8, 2011 under Registration No. 3917098.

46.     On September 4, 2012, Vazquez filed a federal trademark application for the mark HANDLE WITH CARE PRODUCTIONS, INC.  The mark was registered on May 13, 2013 under Registration No. 4334205.

47.     On or about August 21, 2012, in anticipation of closing HWCP, Vazquez, as the sole officer and shareholder of HWCP, transferred ownership of the LA EXCELENCIA mark in exchange for Vazquez forgiving $8,000 of debt that HWCP owed Vazquez.  This assignment was recorded with the U.S. Patent and Trademark Office.

48.     On or about September 4, 2012, Vazquez filed a federal trademark application for the mark ORQUESTA LA EXELENCIA.  The mark was registered on May 14, 2013 under Registration No. 4334215.  The trademarks in Paragraphs 45, 46 and 48 are collectively referred to as the "Vazquez Trademarks."

**The Copyrights**

49.     Vazquez has obtained the following copyright registrations relating to works by the Band:

-- SR 713-913 for the "Ecos del Barrio" album;

-- SR 713-914 for the "Mi Tumbao Social" album.

These copyrights are collectively referred to herein as the "Band Sound Recordings."

50.     Vazquez is informed and believes and based thereon alleges that Silva has obtained copyright registrations in Silva's own name for the following compositions that were composed solely by Vazquez: "Solo Sin Amor"; "Sentencia"; "La Salsa y el Guaguanco"; "Boogalu Pa' Colombia"; "Por Tu Traicion (Salsa Version)"; "Ana Pa' Mi Tambor"; "Duelo de Bongo"; "Deja de Criticar"; "Vendio su Corazon"; "Nueva York Sin Ti"; "Maria"; "Entre Espinas"; "La Economia" (Album & Single Versions); and "Iyanla."  Collectively, these compositions are referred to herein as the "Vazquez Compositions."

**FIRST CAUSE OF ACTION**
**Declaration of Rights Under the Copyright Act**

51.  Vazquez repeats and realleges each allegation contained in Paragraphs 1-51, above, as if set forth fully herein.

52.     Silva has filed a complaint against Vazquez claiming, among other things, copyright infringement of various compositions allegedly written by Silva.

53.  Silva has disputed Vazquez's claim to ownership of the copyrights for the "Ecos del Barrio" and "Mi Tumbao Social" albums, among other works.

55.     Vazquez believes and alleges herein that his actions have not infringed on any legitimate copyright owned by Silva.

56.  Vazquez also believes and alleges that any claims by Silva to the copyrights set forth in Paragraph 49, above, are invalid and unenforceable.

57.  Vazquez also believes and alleges that he is the sole owner to all rights in and to the copyrights in the Vazquez Compositions.

58.     There is now an actual controversy between Silva and Vazquez regarding these copyrights.

59.     Vazquez prays for a judgment declaring that his copyrights are valid and that he has not infringed on any valid copyright owned by Silva.

## SECOND CAUSE OF ACTION
### Declaration of Trademark Rights

60.  Vazquez repeats and realleges each allegation contained in Paragraphs 1-59, above, as if set forth fully herein.

61.  As set forth above, Vazquez is the owner of the federally registered marks LA EXCELENCIA; HANDLE WITH CARE PRODUCTIONS, INC.; and ORQESTA LA EXELENCIA

62.     Silva has filed a complaint against Vazquez claiming, among other things, trademark infringement and trademark dilution by Vazquez of marks allegedly owned by Silva.

63.  Silva has disputed Vazquez's claim to ownership of the Vazquez Trademarks.

64.     Vazquez believes and alleges herein that the Vazquez Trademarks do not infringe on and have not diluted any marks legitimately owned by Silva.

65.  Vazquez also believes and alleges that any claims by Silva to the Vazquez Trademarks are invalid and unenforceable.

66.  There is now an actual controversy between Silva and Vazquez regarding the Vazquez Trademarks.

67.     Vazquez prays for a judgment declaring that the Vazquez Trademarks are valid and that he has not infringed or diluted any mark owned by Silva.

## THIRD CAUSE OF ACTION
### Intentional Interference with Economic Advantage

68.     Vazquez repeats and realleges each allegation contained in Paragraphs 1-67, above, as if set forth fully herein.

69.     By reason of his efforts and money spent developing the Band, his contacts in the music industry and the goodwill associated with the Band's trademark, at the time of the events described above, Vazquez was in a position to realize substantial economic benefits from his efforts and investments.

70.     Furthermore, at all times described above, Silva was and now is aware that Vazquez was and now is in a position to realize substantial future economic benefits through his efforts with and investments in the Band.

71.     By virtue of Silva's unlawful intentional acts in contacting promoters and venue managers to cancel the Band's concerts, asserting rights that he does not and never has possessed, stealing the Band's written music, stealing the Masters and undermining the Band, Silva unlawfully and intentionally interfered with Vazquez's prospective business interests and advantages.

72.     As a direct and proximate result of Silva's unlawful acts, Silva has damaged Vazquez in an amount which cannot be ascertained without an accounting but which he is informed and believes is in excess of $75,000.

73.     The foregoing acts and misrepresentations by Silva were willful, malicious and oppressive and were undertaken without regard for Vazquez's rights.  By reason thereof, Vazquez seeks exemplary and punitive damages against Silva by way of example and to punish Silva.

## FOURTH CAUSE OF ACTION
### Intentional Interference with Contractual Relations

74.     Vazquez repeats and realleges each allegation contained in Paragraphs 1-73, above, as if set forth fully herein.

75.     As set forth above, Vazquez has, and HWCP had, contractual relationships with promoters, recording studios and venue managers.  As a result of these contractual relationships, HWCP was, and Vazquez is in a position to realize substantial economic benefits by reason of these contractual relationships.

76.     Furthermore, at all times described above, Silva was and now is aware that Vazquez was and now is in a position to realize substantial future economic benefits through the aforementioned contractual relationships.

77.     By virtue of Silva's unlawful intentional acts in contacting promoters and venue managers to cancel the Band's concerts, asserting rights that he does not and never has possessed, stealing the Band's written music and attempting to steal the Band's Masters, Silva unlawfully interfered with Vazquez's contractual business relationships.

78.     As a direct and proximate result of Silva's unlawful acts, Silva has damaged Vazquez in an amount which cannot be ascertained without an accounting but which he is informed and believes is in excess of $75,000.

79.     The foregoing acts and misrepresentations by Silva were willful, malicious and oppressive and were undertaken without regard for Vazquez's rights.  By reason thereof, Vazquez seeks exemplary and punitive damages against Silva by way of example and to punish Silva.

## FIFTH CAUSE OF ACTION
### Breach of Contract

80.     Vazquez realleges and incorporates herein by this reference each and every allegation contained in Paragraphs 1 through 79, as set forth hereinabove.

81.     Silva and Vazquez entered into legally binding contracts pursuant to which Vazquez lent Silva money and Silva agreed to pay Vazquez back.  Silva and Vazquez also entered into a contract whereby Vazquez agreed to loan Silva the multitrack recording machine, and Silva agreed to return it.  Such contracts were made orally.

82.     Vazquez has fulfilled all of his obligations under the contracts by lending Silva at least $9,000 and lending him the recording machine.

83.     Silva breached the contracts by failing to repay Vazquez and by failing to return the recording machine.

84.     Silva's breaches have caused Plaintiff to suffer monetary losses of at least $14,000, representing the money Vazquez lent to Silva and the value of the recording machine.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment

85.   Vazquez realleges and incorporates herein by this reference each and every allegation contained in Paragraphs 1 through 84, as set forth hereinabove.

86.     Silva has obtained, and currently retains, substantial benefits from Silva, namely the money Vazquez lent Silva, the multitrack recorder, the Masters, and the benefits of the Band.

87.     In justice and in equity, such benefits belong to Vazquez, because Vazquez lent the money and recording machine to Silva and received nothing in return. In fact, Vazquez has lost benefits as a result of Silva's retention and/or disposition of the funds and recording machine, namely the opportunity to use the money for his own benefit.

88.     In addition, Silva removed the Masters from the recording studio and has continued to retain them, to the detriment of Vazquez.

89.     Justice and equity also compel the return of the money and the recording machine to Vazquez because Silva acquired the funds, the recording machine and the Masters from Silva by fraud, deception and other wrongful means.

90.     Silva's continued retention of the funds lent and the machine constitutes unjust enrichment.  Under the principles of equity and law, Silva must disgorge such enrichment to Vazquez and make restitution to him.

91.     Silva's conduct has caused Vazquez to suffer damages in the amount of at least $50,000.00.

**SEVENTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**

92.     Vazquez realleges and incorporates herein by this reference each and every allegation contained in Paragraphs 1 through 91, as set forth hereinabove.

93.     If it is found that Silva was a partner in any entity with Vazquez, or that Silva was a 50% shareholder with Vazquez in HWCP as well as an officer of the corporation, as he has alleged, then Silva would have owed Vazquez duties attendant to that partnership, shareholder and/or office position.

94.     Among those duties Silva would have owed is a fiduciary duty, which encompasses the obligation of utmost good faith and the duty of full disclosure to any partners or shareholders.

95.     Silva breached the duties throughout 2012 and 2013 by falsely claiming ownership over Vazquez's copyrights and trademarks, attempting to interfere with the Band's concerts, and threatening band members, promoters and venue managers and owners.

96.     Silva also breached his fiduciary duties by diverting business opportunities to his own musical efforts in California and elsewhere, during the period that he was allegedly a partner or shareholder with Vazquez.

97.     As a result of Silva's breaches, Vazquez has been injured and has suffered monetary losses in an amount to be determined.

## EIGHTH CAUSE OF ACTION
### Contribution

98.     Vazquez realleges and incorporates herein by this reference each and every allegation contained in Paragraphs 1 through 84, as set forth hereinabove.

99.     If it is found that Silva was a partner in any entity with Vazquez, or that Silva was a 50% shareholder with Vazquez in HWCP, as he has alleged, then Counterclaim Defendant Silva would be responsible for financial contributions to Vazquez pursuant to New York law.

100.     Vazquez has spent more than $70,000 on the Band and HWCP.

101.     If Silva was an equal partner or 50% shareholder with Vazquez in HWCP, then Silva owes Vazquez a contribution equal to at least one half of Vazquez's financial contribution to the Band, according to proof.  Vazquez believes in good faith that Silva's share would exceed $35,000.

102.     If Silva was the sole owner of HWCP, then Silva owes Vazquez for all financial contributions Vazquez made to HWCP and the Band, according to proof.  Vazquez believes in good faith that Silva's contribution would exceed $70,000.

103.     Wherefore, Vazquez demands that, if Silva is found to own some or all of HWCP and/or the Band, Silva make a contribution to Vazquez equivalent to his ownership stake and profit interest.

WHEREFORE, Vazquez prays for the following on his Counterclaims:

1.  For a declaration that he has not infringed on any valid copyrights belonging to Silva;

2.  For a declaration that Vazquez owns all right, title and interest in and to the copyrights in the Vazquez Compositions and the Band Sound Recordings.

3.  For a declaration that Vazquez owns all right, title and interest in and to the Vazquez Trademarks;

4.  For a declaration that Vazquez has not infringed or diluted any valid trademarks belonging to Silva;

5.  For an award in excess of $75,000, according to proof, together with pre- and post-judgment interest to compensate Vazquez for Silva's intentional interferences with Vazquez's contracts and economic advantage, and for Silva's breaches of fiduciary duty, contract and contribution;

6.  For punitive damages to make an example of Silva and to punish him;

7.  For Vazquez's reasonable attorney's fees incurred in this action; and

8.  For such other relief as the Court may order.


COUNTERCLAIMANT HEREBY DEMANDS A TRIAL BY JURY PURSUANT TO FED. R. CIV. P. 38 AND CONSTITUTIONAL AMENDMENT SEVEN


Dated:  June 28, 2013  　　　　　　　　  /s/ Michael D. Steger
　　　　　　　　　　　　　　　　　　　　 Michael D. Steger (MS2009)
　　　　　　　　　　　　　　　　　　　　 Steger Krane LLP
　　　　　　　　　　　　　　　　　　　　 Attorneys for Defendants
　　　　　　　　　　　　　　　　　　　　 1601  Broadway, 12th Floor
　　　　　　　　　　　　　　　　　　　　 New York, NY  10019
　　　　　　　　　　　　　　　　　　　　 (212) 736-6800
　　　　　　　　　　　　　　　　　　　　 (845) 689-2155 (fax)
　　　　　　　　　　　　　　　　　　　　 msteger@skattorney.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this June 28, 2013 I served a true and correct copy of the attached

Answer and Counterclaims electronically by ECF on counsel for all parties:

Peter C. Dee

Mavronicolas, Muller & Dee, LLP

950 Third Avenue, 10th Floor

New York, NY  10022

pdee@mavrolaw.com

_/s/ Michael D. Steger_____

Michael D. Steger